**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

LISA GARNER

        Plaintiff,

v.                                                                  Case No. 07-CV-11847

ROBERT GRANT,

        Defendant.
_____/

**OPINION AND ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

This case arises from the accidental drowning of Plaintiff Lisa Garner's eleven-month old daughter, Karlie, in the family's swimming pool. Plaintiff, sadly, was somehow occupied or otherwise inattentive during the critical few minutes in which the child crawled through a sliding door, left open by Plaintiff as was her habit, out to the edge of the family's in-ground pool and there into the water. A two-count criminal action was brought against Plaintiff by the Wayne County Prosecuting Attorney based upon her alleged culpable negligence, although she was subsequently acquitted of all charges. Plaintiff brought this case against Defendant Robert Grant, the police officer in charge of the investigation, under 42 U.S.C. § 1983. Before the court is Defendant's motion for summary judgment, filed on December 10, 2007. The matter has been fully briefed and the court concludes a hearing is unnecessary. *See* E.D. Mich. LR 7.1(e)(2). For the reasons stated below, the court will grant Defendant's motion.

## I. BACKGROUND

With only one exception, all of the relevant facts of this case are undisputed. This case turns on whether the one disputed fact is material.

After her daughter was born on July 29, 2005, Plaintiff Lisa Garner stayed at home to care for her. On June 27, 2006, Plaintiff fed and dressed her daughter and was in the den of her house. According to Plaintiff, sometime later she "must have zoned out" for about ten minutes. Realizing that she did not know where the child was, Plaintiff began searching for her. She guessed that this may have taken about another ten minutes, and eventually found the child, face down, in the swimming pool but hidden by the pool's solar cover. Plaintiff pulled her daughter from the pool and took her to her neighbors' house, where neighbors performed CPR until paramedics arrived. At the hospital she was pronounced dead on arrival.

Defendant Detective Lieutenant Robert Grant interviewed Plaintiff at the hospital, asking what had happened. Plaintiff told him that she "zoned out" for about ten minutes, looked for Karlie for about ten minutes and then found her in the pool. Plaintiff told Defendant that the child must have gotten out through the sliding glass door, and that she routinely left the door partially open so that the cat could get outside. According to Plaintiff, she indicated, using gestures rather than verbally, that she left the door open around three or four inches; Defendant asserts that she indicated about six inches. For purposes of this motion, the court will accept Plaintiff's recollection of the estimate, although the difference is essentially immaterial in view of the agreed-upon fact that the child, in fact, was able to crawl through whatever space was created by the opening. Defendant did not notice any evidence of alcohol consumption.

2

Defendant also interviewed Plaintiff's husband, Craig Garner, at the hospital's trauma room. He was obviously upset and still holding the body of the child in his arms at the time. Defendant testified that he apologized for the timing of his intended questions, and that Mr. Garner told the Detective, "you can talk to me, but I'm not setting the baby down." (Pl.'s Ex. J at 26). The Detective proceeded with his questions. Mr. Garner told Defendant that he had previously told Plaintiff not to leave the door open. According to Defendant's contemporaneous notes, and his subsequent testimony, Mr. Garner stated "I told her all the time not to leave that door open--everyday she leaves the door open like that. I warned her about it--that something like this could happen." (Def.'s Exs. C at 8 & E at 26-31.) According to Mr. Garner and his father, who was in the room during the interview, Mr. Garner did not indicate that he "warned" his wife that "something like this could happen." Mr. Garner agrees, however, that he told the Detective that he had repeatedly told his wife to keep the door closed, that she habitually left it open and that it bothered him for her to have it open.[1] He testified at the Plaintiff's preliminary examination that the only statement attributed to him by Defendant with which he would "take issue" was "I warned her something like this could happen." (Pl.'s Ex I, p. 23.) Plaintiff herself agrees that it was in fact her habit to leave the sliding door open for the cat, (Pl.'s Ex H at 13), and that her husband "complained" about her practice. *(Id.* at 26-27.)

---

[1] He later stated that what he meant was merely that with the door open flies could get into the house and the air conditioning would be wasted. (Pre. Hr'g. Tr. at 10, Pl.'s Ex. M.)

A medical examiner's autopsy found no obvious signs of any trauma: "no bruising anywhere on the body--no scrapes or cuts-- and the child looked healthy and not abused in any way." (Def.'s Ex. C at 9.) Defendant's investigation report also indicates that the Garners' "home was well-kept and from all observations in the house, the baby, Karlie, was well taken care of by the Garners." (*Id.* at 9.)

Defendant forwarded the complete investigator's report to the Wayne County Prosecutor's Office. Although the cover sheet form was entitled "warrant request," Defendant specified no offense in the blank labeled "Offense," in which also was noted, "To be filled in by Prosecutor;" Defendant testified without contradiction that he in fact "requested" nothing, leaving the review and the decision entirely up to the Prosecuting Attorney. (Def.'s Dep. at 41-42.)

Included in Defendant's report was Mr. Garner's statement, containing these three components: first, "I told her all the time not to leave the door open," second, "every day she leaves the door open like that," and, the challenged third component, "I warned her about it – that something like this could happen."

Assistant Wayne County Prosecutor Daniel E. Less, assigned to the Prosecutor's "Child and Family Abuse Unit," reviewed the report and recommended a warrant be issued for criminal charges of 1) involuntary manslaughter and 2) second-degree child abuse. Mr. Less subsequently stated in an affidavit presented by Plaintiff that criminal charges would not have been instituted had it not been for the inclusion of "the statement attributed to Mr. Garner." His affidavit also states that had the Garner statement been limited to "told her not to leave the door open," it would have been "highly unlikely" that he would have recommended a warrant.

4

Plaintiff was arraigned on charges of involuntary manslaughter and second degree child abuse. A preliminary examination was held on August 22, 2006. Craig Garner testified at the hearing regarding the interview between him and Defendant:

> Detective Grant asked me if I knew what happened that day[.] And I had told him, "no, I was at work." He told me that apparently, Karlie had gotten through the door and fell into the pool. I then--I don't remember if he asked me anything else at that point, but I did say, "I told her not to leave that door open." [A]nd then I immediately followed up and said "but she didn't know something like this could happen, she didn't know Karlie could get out that door."

(Pre. Hr'g. Tr. at 10, Pl.'s Ex. M.) He also explained that he had told his wife not to leave the door open because he was concerned about wasting the air conditioning and also about flies coming in. (*Id.*) He testified that he knew she would "leave [the door] open in the morning so the cat could go outside and sit." (*Id.* at 15.) Mr. Garner was read the statement attributed to him by Detective Grant, "I told her all the time not to leave the door open, everyday she leaves that door open like that. I warned her about it that something like this could happen;" Mr. Grant denied making it as read (*Id.* at 11.)[2] Defendant testified at the hearing that Mr. Garner had indeed stated that he warned Plaintiff not to keep the door open "because something like this could happen." (*Id.* at 29-30.)

The state court took the matter under advisement and rendered a decision one week later, on August 29, 2006. The court summarized the evidence that had been presented, including the competing testimony of Mr. Garner and Defendant regarding

---

[2] At his deposition, Mr. Garner clearly specified that the only part of the Detective's attribution to him with which he disagreed was "I warned her something like this could happen." (Pl.'s Ex I, p. 23.)

what Mr. Garner said at the hospital. (8/29/06 Pre. Hr'g. Tr. at 5-6, Pl.'s Ex. N.) The court then concluded:

> The issue is whether or not the [c]ourt is satisfied that sufficient evidence has been introduced from which the element of gross negligence may be inferred. . . . I will only say that I do believe this is one of the more difficult cases that I've handled personally.
>
> However, the [c]ourt will indicate that while the low threshold requirement of probable cause is met in the great majority of felony cases, thus requiring a bind-over, this case is an extremely difficult, close call.
>
> However, the [c]ourt does believe that there is sufficient evidence on the record to establish probable cause to believe that the defendant committed the crime charged. The Medical Examiner's Report, with the stipulated findings, established the cause of death. The defendant made the statement to Detective Grant that she "zoned out;" furthermore, that she left the doorwall open three to six inches everyday, so that the dog and cat could go in and out of the backyard as they pleased. Moreover, Mr. Garner made the statement to Lieutenant Grant that, "I told her all the time not to leave that door open. Everyday she leaves the door open like that. I warned her about it that something like this could happen." The fact is that the child was able to crawl and the doorwall in question was open; moreover, that the doorwall in question leads from the dining room, down one step to cement, which is just a few feet away from the pool. Again, while there is a step leading to the concrete which surrounds the pool, no other impediment existed.
>
> Based upon that, there is sufficient evidence to infer that the element of gross negligence has been met. This [c]ourt will reiterate that this was a close question and whether the prosecutor will be able to prove the case is another issue. However, it's not within the [c]ourt's province to base its decision on likelihood of conviction.

(*Id*. at 7-8.) Plaintiff was bound over for trial, which commenced on April 3, 2007. Plaintiff was acquitted of both charges.

## II. STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to

6

judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).  "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate."  *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

The court does not weigh the evidence to determine the truth of the matter, but rather, to determine if the evidence produced creates a genuine issue for trial.  *Sagan*, 342 F.3d at 497 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  The moving party must first show the absence of a genuine issue of material fact.  *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000) (citing *Celotex*, 477 U.S. at 323).  The burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  They must put forth enough evidence to show that there exists a genuine issue to be decided at trial.  *Plant*, 212 F.3d at 934 (citing *Anderson*, 477 U.S. at 256).  Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury."  *Anderson*, 477 U.S. at 251-52 (1986).

The existence of a factual dispute alone does not, however, defeat a properly supported motion for summary judgment – the disputed factual issue must be material.

*See id.* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict – 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'" (alteration in original) (citation omitted)). A fact is "material" for purposes of summary judgment when proof of that fact would establish or refute an essential element of the claim or a defense advanced by either party. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citation omitted).

## III. DISCUSSION

Plaintiff and her husband initiated this action on April 27, 2007, asserting six counts against Defendant Grant and former Defendant the Township of Brownstown. Defendant Brownstown has since been dismissed, and Plaintiff's husband dismissed his sole count of loss of consortium. (*See* 6/22/07 Stip. & 8/0707 Stip.) Defendant now seeks summary judgment on Plaintiff's remaining claims that (1) her arrest[3] and malicious prosecution were without probable cause in violation of the Fourth and Fourteenth Amendment, under 42 U.S.C. § 1983, (2) Defendant violated her

---

[3] In Plaintiff's response, she states that "in light of existing case law, Plaintiff is stipulating to a dismissal of any illegal arrest claim based on state law and 42 [U.S.C. §] 1983." (Pl.'s Resp. at 2.) Plaintiff, in her response *brief,* however, argues the merits of her false arrest claim under § 1983 and further asserts that Defendant's motion should be denied "in its entirety." (Pl.'s Resp. Br. at 17.) Because it is not clear that Plaintiff has conceded any false arrest claim, the court will address the merits of this claim in this order. The court also notes that it does not appear that Plaintiff in fact asserted a state law claim for false arrest, as the Complaint only clearly lists a state law claim for malicious prosecution.

8

Fourteenth Amendment rights when he allegedly fabricated evidence against her and (3) Defendant committed the state law tort of malicious prosecution.

The existence of probable cause to support Plaintiff's arrest necessarily precludes her entire action. To prevail on a claim brought under 42 U.S.C. § 1983, Plaintiff must prove that Defendant acted "under color of law" and that his conduct deprived Plaintiff of a clearly established right, privilege, or immunity secured by the Constitution or the laws of the United States. 42 U.S.C. § 1983; *Markva v. Haveman*, 317 F.3d 547, 552 (6th Cir. 2003); *Toms v. Taft*, 338 F.3d 519, 524 (6th Cir. 2003); *Ahlers v. Schebil,* 188 F.3d 365, 370 (6th Cir. 1999). The parties do not dispute that Defendant was acting under color of law and the court's focus is therefore on whether Plaintiff can establish a violation of her clearly established constitutional rights.

The Fourth Amendment provides that "[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. Const. amend. IV. It is well-established that the Fourth Amendment requires probable cause for an arrest or seizure of a free citizen, such as Plaintiff. *See Michigan v. DeFillippo*, 443 U.S. 31, 36-37 (1979); *Crockett v. Cumberland College*, 316 F.3d 571, 580 (6th Cir. 2003). Similarly, under Michigan law, a state law claim of malicious prosecution also requires proof that the charge was not

supported by probable cause. *Matthews v Blue Cross & Blue Shield of Michigan*, 572 N.W.2d 603 (Mich. 1998).[4]

Plaintiff's claims, which all require proof of the absence of probable cause, fail for several reasons.

### A. Collateral Estoppel Precludes Plaintiff's Claims

First, Plaintiff is collaterally estopped from relitigating the issue of probable cause, which was determined at the preliminary hearing. The court must apply the state law of collateral estoppel when deciding whether the state court's determination of probable cause at the preliminary hearing has preclusive effect in a subsequent action. *Haring v. Prosise*, 462 U.S. 306, 313 (1983).

> Under Michigan law, issue preclusion applies when 1) there is identity of parties across the proceedings, 2) there was a valid, final judgment in the first proceeding, 3) the same issue was actually litigated and necessarily determined in the first proceeding, and 4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding.

*Darrah v. City of Oak Park,* 255 F.3d 301, 311 (6th Cir. 2001) (citing *People v. Gates*, 452 N.W.2d 627, 630-31 (Mich. 1990)).

In cases in which the issue of probable cause was litigated at the preliminary hearing, a party is precluded from re-litigating it in a subsequent litigation. "[W]here the state affords an opportunity for an accused to contest probable cause at a preliminary hearing and the accused does so, a finding of probable cause by the examining

---

[4]To the extent that Plaintiff asserts a state law claim of false arrest, the absence of probable cause is an essential element of a false arrest claim under Michigan law. *See Burns v. Olde Discount Corp.*, 538 N.W.2d 686, 688 (Mich. Ct. App. 1995) ("A claim of false arrest requires proof that the arrest lacked probable cause.").

10

magistrate or state judge should foreclose relitigation of that finding in a subsequent § 1983 action." *Coogan v. City of Wixom*, 820 F.2d 170, 175 (6th Cir. 1987), *overruled on other grounds by Frantz v. Vill. of Bradford*, 245 F.3d 869, 874 (6th Cir. 2001).

Plaintiff contends, however, that she can leap this hurdle and contest the magistrate's probable cause determination because it was based on allegedly fabricated evidence submitted by Defendant regarding Mr. Garner's statements at the hospital. "Falsifying facts to establish probable cause to arrest and prosecute an innocent person is of course patently unconstitutional." *Hinchman v. Moore*, 312 F.3d 198, 206 (6th Cir. 2002). Thus, under Sixth Circuit law, a § 1983 claim and a claim for malicious prosecution are not barred if Plaintiff can establish that the state court's determination of probable cause was based on materially false statements of Defendant. *See id.* Here, however, the state court's determination was not "based on" the challenged statement, the criticized portion of which was only one component of a larger matrix of evidence. Although the state court summarized all the evidence presented, including the contested portion of Mr. Garner's statement, it did not explicitly rely on it. The court concluded:

> *The fact is that* the child was able to crawl and the doorwall in question was open; moreover, that the doorwall in question leads from the dining room, down one step to cement, which is just a few feet away from the pool. Again, while there is a step leading to the concrete which surrounds the pool, no other impediment existed.
>
> *Based upon that*, there is sufficient evidence to infer that the element of gross negligence has been met.

(8/29/06 Pre. Hr'g. Tr. at 8, Pl.'s Ex. N (emphases added).) Sixth Circuit law only allows relitigation of the probable cause determination when a plaintiff claims that the

11

defendant "made materially false statements to the state judge *that formed the basis of that court's probable cause determination.*"  *Darrah*, 255 F.3d at 311 (emphasis added). Plaintiff cannot show that the alleged fabricated evidence "formed the basis" for the state court's probable cause determination and, therefore, Plaintiff is precluded from relitigating the issue of probable cause.[5]

## B.  Probable Cause Existed to Proceed Against Plaintiff

Even if Plaintiff could establish that the state court actually relied on the allegedly false statement in rendering its probable cause determination, Plaintiff could still not avoid summary judgment because probable cause existed to proceed against Plaintiff even without the challenged component of the statement.  "[O]nly if a false statement was made knowingly and intentionally, or with reckless disregard for the truth and if, with the [officer's] false material set to one side, the [defendant's conduct] is insufficient to establish probable cause, is there a constitutional violation under the Fourth Amendment."  *Hinchman*, 312 F.3d at 206 (citing *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir.1989) (internal quotation marks and alterations omitted)).

"'[P]robable cause' to justify an arrest means facts and circumstances . . . that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to

---

[5]Moreover, as discussed further below, the challenged statement, that Mr. Garner said that he had "warned" Plaintiff that something like this could happen, is not even material under the facts of this case.  The critically sufficient facts in the probable cause determination are those expressly admitted by Plaintiff.  To the extent Mr. Garner's statement is material at all, it is the admitted portion of the statement that is more damaging to Plaintiff: that she left the door open every day, and that she was told not to do so.

12

commit an offense." *DeFillippo*, 443 U.S. at 37. "The probable cause determination is essentially the same under Michigan law." *Hinchman*, 312 F.3d at 204. "Probable cause to arrest exists where the facts and circumstances . . . are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *People v. Champion*, 549 N.W.2d 849, 860 (Mich. 1996).

Here, even absent the contested portion of the Garner statement, probable cause existed as a matter of law to conclude that Plaintiff may have been culpable in the death of the child under a theory of either "second degree child abuse," "involuntary manslaughter," or both. Under Michigan law, "[a] person is guilty of child abuse in the second degree if . . . the person's reckless act causes serious physical harm to a child." Mich. Comp. Laws §750.136b(3)(a). Because the statute does not define "reckless," Michigan courts allow the plain ordinary meaning of the term, and courts may consult dictionary definitions in arriving at that meaning. *People v. Gregg*, 520 N.W.2d 690, 692 (Mich. Ct. App. 1994). In *Gregg*, the court looked to two different dictionaries to define "reckless" under the Michigan child abuse statute, stating:

> Black's Law Dictionary (6th ed) defines "reckless" as:
>
> Not recking; careless, heedless, inattentive; indifferent to consequences. According to circumstances it may mean desperately heedless, wanton or willful, or it may mean only careless, inattentive, or negligent. For conduct to be "reckless" it must be such as to evince disregard of, or indifference to, consequences, under circumstances involving danger to life or safety to others, although no harm was intended.
>
> The Random House College Dictionary, Revised Edition, defines "reckless" as:
>
> 1. utterly unconcerned about the consequences of some action; without caution; careless ... 2. characterized by or proceeding from such carelessness.

13

*Gregg,* 520 N.W.2d at 692. Similarly, to prove gross negligence amounting to involuntary manslaughter under Michigan law, the evidence must show:

> (1) defendant's knowledge of a situation requiring the use of ordinary care and diligence to avert injury to another, (2) her ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand, and (3) her failure to use care and diligence to avert the threatened danger when to the ordinary mind it must be apparent that the result is likely to prove disastrous to another.

*People v. Albers,* 672 N.W.2d 336, 339 (Mich. Ct. App. 2003) (citations omitted).

Viewing the evidence in a light most favorable to Plaintiff, and accepting only Mr. Garner's version of his statement (indeed, even *disregarding Mr. Garner's statement entirely*), probable cause existed as a matter of law based on the undisputed facts which were presented both to the state court judge and to this court. The heart of the probable cause determination need not be based on anything Mr. Garner said, but on the circumstances described by Plaintiff herself, leading to the child's death. She alone was in charge of this eleven-month-old baby; she knew the child was mobile and crawling; she explained that she "zoned out" for some period of time, being unaware of the whereabouts of the child during that time; she had intentionally left open the door leading directly to an inground pool. Within these undisputed facts, probable cause existed to proceed against Plaintiff. A prudent person, or a person of ordinary caution would be warranted in the belief that Plaintiff's actions were "careless, inattentive, or negligent . . . or indifferen[t] to, consequences, under circumstances involving danger to life or safety to others, although no harm was intended," or "utterly unconcerned about the consequences of some action; without caution; careless." *Gregg,* 520 N.W.2d at 692. A prudent person, or a person of ordinary caution would also be warranted in the

14

belief that Plaintiff had "knowledge of a situation requiring the use of ordinary care and diligence to avert injury to another . . . [and was able] to avoid the resulting harm by ordinary care and diligence in the use of the means at hand," but failed to "use care and diligence to avert the threatened danger when to the ordinary mind it must be apparent that the result is likely to prove disastrous to another." *Albers,* 672 N.W.2d at 339. What Mr. Garner said, and however he may have said it, may have influenced the determination at the prosecutorial discretion stage,[6] but as a matter of Fourth Amendment law, it merely supplemented the essential circumstances that demonstrated probable cause to believe that culpable negligence was present.

Because probable cause existed as a matter of law to proceed against Plaintiff, her claims must fail. *See Hinchman*, 312 F.3d at 206; *see also Darrah*, 255 F.3d at 312 ("[I]f this court finds that there was probable cause to prosecute Darrah, regardless of any alleged false statements made by Bragg, then she cannot make out a malicious prosecution claim under the Fourth Amendment."). Summary judgment is therefore properly granted to Defendant.

---

[6] Actually, even this is not entirely clear. Although the affidavit signed by Assistant Prosecutor Less states that, had Mr. Garner's statement been limited to "told her not to leave the door open," it would have been "highly unlikely" that he would have recommended a warrant. But Mr. Garner acknowledges that he said more than just that, and Mr. Less says nothing about the likely outcome of his charging decision if the statement had been presented as Mr. Garner acknowledged he had said it, i.e., comprising the first *and* the second component but not the third. The Detective's report, ignoring the third component of Garner's statement, would have still contained this paraphrase of the second: " . . . he even warned her to keep that door shut on several other occasions . . . ." (Pl.'s Ex E, p. 00004). The court does not know what Mr. Less might think about how this statement, in conjunction the things admitted by Plaintiff, might have influenced his decision. In any event, as indicated in the body of this Opinion, what an assistant prosecutor thought then or thinks now is not the measure of whether or not probable cause to proceed in fact existed.

15

### C. Plaintiff Cannot Sustain a Fourteenth Amendment Claim

Plaintiff argues that even if probable cause existed to arrest her, she can nonetheless maintain a Fourteenth Amendment claim against Defendant for the alleged fabrication of evidence. (Pl.'s Resp. Br. at 15.) Plaintiff relies on *Chavez v. Martinez,* 538 U.S. 760 (2003), in which the Supreme Court stated:

> The Fourteenth Amendment provides that no person shall be deprived "of life, liberty, or property, without due process of law." Convictions based on evidence obtained by methods that are "so brutal and so offensive to human dignity" that they "shoc[k] the conscience" violate the Due Process Clause. *Rochin v. California*, 342 U.S. 165, 172, 174, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (overturning conviction based on evidence obtained by involuntary stomach pumping). *See also Breithaupt v. Abram*, 352 U.S. 432, 435, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957) (reiterating that evidence obtained through conduct that " 'shock[s] the conscience' " may not be used to support a criminal conviction). Although Rochin did not establish a civil remedy for abusive police behavior, we recognized in *County of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), that deprivations of liberty caused by "the most egregious official conduct," id., at 846, 847-848, n. 8, 118 S.Ct. 1708, may violate the Due Process Clause. While we rejected, in Lewis, a § 1983 plaintiff's contention that a police officer's deliberate indifference during a high-speed chase that caused the death of a motorcyclist violated due process, id., at 854, 118 S.Ct. 1708, we left open the possibility that unauthorized police behavior in other contexts might "shock the conscience" and give rise to § 1983 liability. Id., at 850, 118 S.Ct. 1708.

*Chavez,* 538 U.S. at 774. Plaintiff argues that "[d]eliberately fabricating evidence against an accused person falls within this category," (Pl.'s Resp. at 16), and contends that "[i]t is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Gregory v. City of Louisville,* 444 F.3d 725, 737 (6th Cir. 2006) (citing *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997)). While the court notes that such claims are typically analyzed under the

16

Fourth Amendment, *see id.*, the court nonetheless concludes as a matter of law that the facts in this case simply do not, under any stretch or implication, "shock the conscience."

Viewing the facts in a light most favorable to Plaintiff, and accepting as true Mr. Garner's version of what he said at the hospital, Plaintiff cannot establish that Defendant made any *materially* false statements. For the reasons discussed above, Plaintiff cannot establish that Defendant's statement "was material to the finding of probable cause." *Id.* at 758. Plaintiff argues that "[a] claim of fabrication of evidence does not require a conclusion that the state did not have probable cause to prosecute the claimant." *Stemler*, 126 F.3d at 872. While this may be true, it does require proof that "there is a reasonable likelihood that the false evidence could have affected the judgment of the jury." *Id.* Here, in light of the admissions made by Plaintiff, Defendant's version of Mr. Garner's could not have affected the determination of probable cause.

Further, the difference between Mr. Garner's version of the statement and Defendant's version of the statement is so slight that no reasonable jury could possibly conclude that Defendant had "fabricated" the evidence. The only difference between the two versions is whether Mr. Garner made the additional comment about a warning that "something like this" could happen. While the court understands the weight that Plaintiff is attempting to invest in this statement, it is simply not "smoking gun" evidence that Plaintiff contends. The material portion of Mr. Garner's statement is Plaintiff's consistent practice of leaving the door open every day, despite being told not to do so.[7]

---

[7] The contested third portion of the statement actually constitutes nothing more than a reasonable conclusion that almost anyone would draw from these

Even the first, and uncontested, portions of Mr. Garner's statement are not so material in light of the fact that Plaintiff admits that on the day in question she left the door open, consistent with her habit. Defendant's statement, which simply supports a slightly different version of a conversation everyone agrees occurred, cannot support a claim under the Fourteenth Amendment. *Accord United States v. Lochmondy,* 890 F.2d 817, 822 (6th Cir. 1989) ("The knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury . . . and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony." (citations omitted)). To hold otherwise would be to fling open the door to constitutional litigation in almost every case in which there is any alleged variance between the version of statements recorded by investigators and a version later claimed by a witness.

## IV.  CONCLUSION

The court, of course, appreciates the tragic and difficult situation in which Plaintiff found herself. To conclude, as the court does here, that probable cause in fact existed to proceed against Plaintiff is *not* to conclude that the case ought to have been prosecuted in the absence of evidence of more active or substantial neglect.[8] Further,

---

uncontroverted predicates: Plaintiff habitually left the door open, having been told to leave the door closed; there was a mobile child in the house; a swimming pool lay just outside the usually-open door; swimming pools are generally known to represent a high degree of danger to very young children; *therefore, one must be aware that "something like this" could happen.* Such an obvious conclusion need not be articulated to be true.

[8] The central aspect of a prosecuting attorney's case-charging responsibility is to exercise professional discretion in evaluating whether there is a good faith belief that a proposed criminal case can actually be proven beyond a reasonable doubt. Many case investigations may present the prosecutor with "probable cause." Some are far stronger,

some of the actions of Defendant, at least as described by Plaintiff, can be described as insensitive.[9] Nonetheless, Plaintiff's evidence does not support her complaint. Accordingly,

IT IS ORDERED that Defendant's "Motion for Summary Judgment" [Dkt. # 17] is GRANTED.

       S/Robert H. Cleland
       ROBERT H. CLELAND
       UNITED STATES DISTRICT JUDGE

Dated: February 8, 2008

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, February 8, 2008, by electronic and/or ordinary mail.

       S/Lisa Wagner
       Case Manager and Deputy Clerk
       (313) 234-5522

---

further past the threshold, than others. The prosecutor, however, does not have unlimited resources to pursue each and every possible case, thus not all investigations that rise to the level of probable cause *must* result in criminal charges. The authorizing assistant prosecutor in this case, in his affidavit, does not retreat from his determination of probable cause sufficient to charge, but does seem to be signaling that the criminal case against Plaintiff was, perhaps, less than well-advised. The court is inclined to agree.

[9]On the other hand, the court recognizes that the complained of actions look in retrospect particularly insensitive or too-aggressive, *given the facts as they eventually came to light in this case*. Under circumstances not present here where a child's injury was caused by actions that turned out to be more obviously criminal, a detective's doggedness, even to the point of being "insensitive," may well be applauded as trying to vindicate the rights of a child victim. Before all facts are brought to light, a good investigator cannot safely conclude that a terrible accident, as opposed to something sinister, was responsible for the tragedy at hand. These kinds of cases, the court observes, are not often easy for *anyone* involved at *any* level.